**Riley McCOY, et al., Respondents,**

v.

**THE HERSHEWE LAW FIRM, P.C., Appellant.**

**No. WD 72728.**

Missouri Court of Appeals, Western District.

April 10, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 2012.

James Patrick Frickleton and Edward Deroy Robertson, III, Leawood, KS, for respondents.

Susan Ford Robertson and J. Zachary Bickel, Kansas City, MO and Bryan Ormsby Wade and Christopher Francis Weiss, Springfield, MO, for appellant.

Division Three: KAREN KING MITCHELL, P.J., JAMES M. SMART, JR., and GARY D. WITT, JJ.

JAMES M. SMART, JR., Judge.

The Hershewe Law Firm ("HLF") appeals the ruling of the circuit court of Jackson County determining the value of the law firm's claim in quantum meruit for attorneys' fees in a personal injury contingency case. HLF contends that the trial court erred in refusing to transfer the venue of the attorneys' fee determination to Jasper County, the county in which the law firm's office is located. The firm further contends that the trial court erred in determining the amount to be awarded HLF in quantum meruit, arguing that the judgment lacks substantial evidence and the trial court misapplied the law. We affirm.

### Statement of Facts

On August 20, 2007, Ronald and Stacey McCoy gave birth to Riley McCoy at a hospital in Joplin, Missouri. Riley was born with very significant permanent brain damage, allegedly caused by the negligence of the medical personnel attending the birth. Several months later, Mr. and Mrs. McCoy were referred by a friend to the Hershewe Law Firm to assist them with pursuing a medical negligence action.

The McCoys met with Aaron Smith, an associate who had worked at HLF approximately four years, and agreed to have HLF represent them and their child in the matter. They entered into a contingency-fee contract with HLF. About four months after undertaking the matter, Smith filed a petition for damages for medical negligence on the McCoys' behalf in Jasper County against several defendants, including Freeman Health Systems ("medical defendants").

Several months later, while the case was still in a very early stage, Smith informed Ed Hershewe, the founder and principal of HLF, that he was resigning from HLF. Smith promptly sent a letter to the clients he was representing, including the McCoys, advising them of his relocation. The letter gave the McCoys the option of remaining with HLF and having someone else at HLF represent them, or being represented by Smith in his new law firm, or being represented by an entirely different firm of their choosing. The McCoys chose to have their case transferred to Smith at his new firm. After the McCoys made their decision to transfer their case from HLF to Smith, HLF filed a notice of attorneys' lien on June 2, 2008, in the Jasper County case and withdrew from further representation.

Thereafter, in September of 2008, the McCoys signed a new contingency-fee agreement with Smith that specifically permitted Smith to associate with other counsel. Smith then arranged with James Frickleton, of Bartimus, Frickleton, Robertson & Gorny, P.C. ("BFRG"), to assist him with the McCoy case. Smith and Frickleton agreed that any contingency fee awarded in the McCoy case would be divided 60% to BFRG and 40% to Smith, with BFRG to pay future litigation expenses. The McCoys consented in writing to the division of the fees, and BFRG formally entered its appearance in the McCoy case in January of 2009.

The McCoys settled their case about eight months later on August 26, 2009, after participating in mediation with the medical defendants. Before the settlement of $4.7 million was approved, the McCoys dismissed the case in Jasper County without prejudice and refiled it in Jackson County with the intent of obtaining approval of the minor's settlement in that venue.[1] BFRG notified HLF of the proposed settlement on September 28, 2009. BFRG wrote that they would include HLF's litigation expenses in the motion for settlement approval and asked Hershewe to advise him as to the amount of HLF's attorneys' lien.

After receiving no response from HLF, the McCoys filed a motion to determine the value of HLF's attorneys' lien along with a motion to approve the settlement they had reached with the medical defendants. On November 23, 2009, HLF filed a motion seeking additional time to respond to the McCoys' motion so that it could conduct discovery, to which BFRG agreed.

Approximately a month later, HLF filed a motion to stay or continue the hearing on the McCoys' motion to determine the value of HLF's lien, which had been set for January 8, 2010. HLF contended that the

---

1. The parties state different views of the reason that the plaintiffs and defendants in the medical litigation desired to conduct the minor's settlement approval hearing in a county other than Jasper County. The dispute over the motive in transferring venue in this case to Jackson County is not something this court is equipped to resolve, and it is not shown by any party to be material to the disposition of this case. *See Wright v. Bartimus Frickleton Robertson & Gorny PC*, 364 S.W.3d 558, 561–63, 2011 WL 4356175, at *1–2 (Mo.App.2011) (same fact pattern of moving settlement approval to Jackson County).

hearing should be stayed or continued because HLF was not a party to the Jackson County case and not subject to the jurisdiction of the Jackson County court, and the court should defer to Jasper County because the firm already had a declaratory judgment action pending in Jasper County (which action had been filed that same day). The McCoys objected to the proposed stay of their motion. On December 30, 2009, the trial court denied HLF's motion to stay or continue the hearing on the McCoys' motion to determine the value of HLF's lien.[2]

On December 31, 2009, HLF filed a motion to intervene in the McCoys' suit. The motion to intervene was granted. HLF immediately moved for a change of judge under Rule 51.05 and change of venue under Rule 51.045.[3] Judge May granted the motion for change of judge, noting that the venue motion would remain pending with the case. Both the McCoys and the medical defendants opposed the motion to transfer venue. The trial court denied HLF's motion for change of venue, finding that HLF did not have standing to challenge venue since the defendants (and the plaintiffs) were content with venue in Jackson County.

One week later, HLF filed a motion to reconsider the ruling on its motion to transfer venue, this time citing section 508.012, RSMo.[4] On February 3, 2010, without explicitly addressing the motion to reconsider venue, the court approved the minor's settlement in the McCoy case.

The court approved the reimbursement of litigation expenses to HLF in the amount of $11,031.01; to Smith in the amount of $4,826.00; and to BFRG in the amount of $26,069.05; and approved the sum of $1,900,000 in total attorneys' fees. HLF then filed a supplemental motion to transfer venue due to the settlement of the case against the defendants. The court denied both HLF's motion to reconsider and the supplemental motion to transfer venue on February 8, 2010. HLF's writ applications to other courts to compel venue change were denied.

HLF moved for the dismissal of the medical defendants from the lawsuit and again sought a change of venue pursuant to section 508.012.[5] The stipulation of dismissal was approved on May 19, 2010, and the trial court ordered the medical defendants dismissed with prejudice. On the morning of the trial as to attorneys' fees, HLF once again moved for a change of venue, arguing that the court was required to transfer venue because the medical defendants had been dismissed and the trial court was required under section 508.012 to redetermine and transfer venue. The trial court denied the motion and conducted a trial to decide HLF's petition for declaratory and quantum meruit relief.

At the trial, both sides presented expert testimony regarding the contribution that HLF's work on the case provided the McCoys in achieving the settlement with the medical defendants. HLF presented the testimony of Judge J. Miles Sweeney

---

2. The denial of HLF's motion to stay or continue is not at issue in this appeal. HLF's intervention solidified HLF's consent to the exercise of personal jurisdiction over HLF by the Jackson County Circuit Court. *See Wright*, 364 S.W.3d 567–69, 2011 WL 4356175, at *7.

3. All Rule citations are to Missouri Court Rules 2011, unless stated otherwise.

4. All statutory citations are to the Revised Statutes of Missouri 2000, as updated through the cumulative supplement 2010, unless stated otherwise.

5. BFRG agreed among the parties to take responsibility for HLF's claims.

(retired) regarding the value of the services rendered by HLF. Sweeney opined that the reasonable value of these services was $950,000, or 50% of the total attorneys' fee award. The main value that Miles Sweeney attributed to HLF's work was the decision to take the case, which was based on the firm's expertise and reputation with medical negligence cases, and the subsequent engagement and retention by HLF of two medical experts.

The McCoys presented the testimony of Judge John Parrish (retired). John Parrish reviewed the materials from the case, and the list of work Miles Sweeney considered important in the case, and opined that most of the work performed by HLF was "quite preliminary," and was work that legal assistants did, or could have, performed. He testified that HLF's work, as identified by Miles Sweeney, could have reasonably been completed in sixteen hours. Billing at a rate of $300 per hour, John Parrish opined that the value of the services provided by HLF was around $4,800. Neither of these experts testified substantially as to the matter of the relative difficulty of discerning and demonstrating the liability of the medical defendants in the case.

Hershewe, Smith, and Frickleton all testified at length regarding what work each of them, and their respective firms, had performed on the McCoy case. Hershewe testified regarding his significant experience, excellent reputation, and success in representing plaintiffs in medical malpractice cases. He also described his experience in analyzing potential claims of plaintiffs in complex birth trauma medical malpractice cases, and his previous experience bringing claims against the particular medical defendants involved in the McCoys' case. Hershewe's personal involvement in the case included reviewing the obstetrical records, calling and retaining expert witnesses, possibly having reviewed the petition (which was signed only by Smith), and writing one substantive memorandum to the file regarding his conversation with one of the retained doctors. Smith, along with legal assistants, handled the remainder of the work on the McCoy case over the seven months the case was with HLF.

Smith testified that while he was employed at HLF, he spent less than ten hours altogether working on the McCoy case. Smith then estimated that he spent between 200–300 hours working on the McCoy case before BFRG joined the case. Frickleton and Smith concurred with Judge Parrish's observations that the bulk of the work on the case was performed by Smith and BFRG after the case left HLF. Frickleton estimated that his firm spent somewhere between 200–600 hours on the case.

The trial court entered its judgment on June 9, 2010, making thirty separate findings of fact and concluding:

> After a careful analysis of the evidence and applicable law, the Court believes HLF's estimation of the reasonable value of its work performed is subjective and inaccurate. Having considered the factors set forth in Rule 4–1.5 and giving the benefit of the doubt to HLF, the Court believes that the value of the services provided by HLF cannot reasonably be more than $40,000. Accordingly, the court finds that the reasonable value of services provided by HLF to the McCoys is $40,000.

HLF appeals the attorneys' fee award, claiming substantial evidence does not support the trial court's judgment and the trial court misapplied the law. HLF further claims the trial court abused its discretion in refusing to transfer venue.

## Discussion

HLF raises two points on appeal. In Point I, HLF contests the determination of attorneys' fees by the trial court. In Point II, HLF contends the trial court's denial of its motion for change of venue and subsequent motion for reconsideration was in error. Because Point II would be dispositive in this case if we find for HLF, we will address the venue issue before reaching a decision on the merits of the award.

## I. Venue

### Standard of Review

■■■ To the extent that a court bases its venue ruling on factual matters and inferences, this court reviews the trial court's ruling under an abuse of discretion standard. *State ex rel. Trans World Airlines, Inc. v. David*, 158 S.W.3d 232, 233 (Mo. banc 2005). To the extent to which the venue decision is governed by the interpretation of a statute, the ruling is a question of law, and accordingly this court reviews the ruling to determine whether the trial court misinterpreted or misapplied the law. *Cook v. Newman*, 142 S.W.3d 880, 886 (Mo.App.2004).

### Analysis

■■ HLF contends that the trial court erred in denying its requests to transfer venue from Jackson County to Jasper County pursuant to section 508.012 because, HLF says, it became a party defendant by intervening and therefore was entitled to a redetermination of venue both at the time it intervened, and when the medi-

cal defendants were dismissed and removed from the action.[6] The trial court, citing *State ex rel. Linthicum v. Calvin*, 57 S.W.3d 855, 858 n. 3 (Mo. banc 2001), and *State ex rel. Garrison Wagner Co. v. Schaaf*, 528 S.W.2d 438, 442 (Mo. banc 1975), ruled that the McCoys and the medical defendants had consented to venue in Jackson County and that HLF, as an intervenor, did not have standing to challenge venue under section 508.012. Section 508.012 states:

At any time prior to the commencement of a trial, if a plaintiff or defendant, including a third-party plaintiff or defendant, is either added or removed from a petition filed in any court in the state of Missouri which would have, if originally added or removed to the initial petition, altered the determination of venue under section 508.010, then the judge shall upon application of any party transfer the case to a proper forum under section 476.410[.]

HLF contends that this statute requires a redetermination of venue when a law firm intervenes to address its attorneys' lien claim. We disagree.

The passage of Missouri's 2005 Tort Reform Act significantly restricted venue options so as to reduce forum-shopping by plaintiffs. *See* H.R. 393, 93d Gen. Assem., 1st Reg. Sess. (Mo.2005).[7] While the codification of section 508.012 has caused some confusion among practitioners as to the extent of its effect on pre-tort reform venue principles, and there has not yet been substantial judicial interpretation,[8] there is

---

6. Proper venue is not a prerequisite to personal jurisdiction. *See Wright*, 364 S.W.3d 558; *State ex rel. Kansas City Southern Ry. Co. v. Nixon*, 282 S.W.3d 363, 365 (Mo. banc 2009).

7. Michael E. Crowley, *Burning Bridges: Does Joining a Party Sacrifice Venue Selected Before Missouri Tort Reform?*, 64 J. Mo. B. 74, 74–75

(2008); *see also* David Achtenberg, *Venue in Missouri After Tort Reform*, 75 U.M.K.C. L.REV. 593, 595, 602 (2007).

8. The only reported case is *State ex rel. Kansas City Southern Railway Co. v. Nixon*, 282 S.W.3d 363 (Mo. banc 2009).

no apparent reason to believe the 2005 statute includes any change applicable to this intervention.[9]

Prior to 2005, the Supreme Court employed certain principles for determining venue under Chapter 508. First, ·if a plaintiff amended his petition to add a party, the court had to redetermine venue as if the case had just been filed. *See, e.g., State ex rel. Linthicum,* 57 S.W.3d at 858 ("Although a suit is 'brought' against the original defendants when the petition is initially filed, in like manner, it is also 'brought' against subsequent defendants when they are added to the lawsuit by amendment."). Second, unless a party was pretensively joined, the removal of a party from the petition, whether by the court's action or the party's voluntary decision to dismiss, *did not* affect venue. *See id.* Third, the defendant's decision to file a third-party petition, or the intervention by any party, had *no* effect on venue, if venue was proper based on the plaintiff's petition. *See id.* at 858 n. 3 (citing *State ex rel. Garrison Wagner Co.,* 528 S.W.2d at 442).

Section 508.012 appears to require a venue redetermination when plaintiffs amend their petitions to add or remove from the petition a plaintiff, defendant, or third-party plaintiff or defendant. A redetermination of venue for the addition of parties is nothing new. However, redetermining venue on the removal of a party *or* on the addition or removal of a third-party plaintiff or defendant (hereafter collectively or individually referred to as a "third party") is a departure from previous court interpretations regarding venue. The courts of Missouri have addressed section 508.012 only once substantively since the 2005 revisions in *State ex rel. Kansas City Southern Railway Co. v. Nixon,* 282 S.W.3d 363 (Mo. banc 2009). *Nixon* is not instructive in this case, however, as it did not involve intervention but dealt with the addition of a defendant and whether the court could allow the plaintiff to amend his petition to cure the defective venue.[10] *See id.* at 365–66.

HLF argues that because it intervened, it became a "defendant" within the meaning of section 508.012, and thus a redetermination of venue was required by the court after its request was granted. HLF asks this court to interpret section 508.012 as requiring a redetermination in venue upon the addition of an intervenor. The argument is that the intervenor falls within section 508.012's definition of a "defendant" or a "third-party defendant." We find that argument to be without authority and to be logically tenuous.

The "cardinal rule" of statutory interpretation is "to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning." *In re Boland,* 155 S.W.3d 65, 67 (Mo. banc 2005). "In ascertaining the legislative intent as expressed in a statute courts are aided by certain well established rules." *Wright v. J.A. Tobin*

9. For a useful discussion of the statute, see Achtenberg, *supra* n. 7, at 681 (suggesting that "section 508.012 makes relatively minor changes in the pre-tort reform principles and will not have the drastic effect some have feared").

10. In *Nixon,* the Court addressed whether the ministerial duty to transfer venue must be exercised immediately by the trial court, requiring the trial court to take no other action, or if the trial court may allow the addition of a party to cure a defect in venue before transferring the case, so as to prevent the unnecessary transfer and refiling of the case. *Id.* at 366. The Court held that "where ... the addition of a party cures a defect in venue, the case should remain in the court where venue is proper considering the newly added party." *Id.*

*Constr. Co.,* 365 S.W.2d 742, 744 (Mo.App. 1963). "One such rule is that in the construction of statutes it is presumed that the legislature is aware of the interpretation of existing statutes placed thereon by the states' appellate courts, and that in amending a statute or enacting a new one on the same subject it is ordinarily the intent of the legislature to effect some change in the existing law." *Id.* Further, the rule of statutory construction stated as *"expressio unius est exclusio alterius,"* or "the express mention of one thing implies the exclusion of another," allows an inference that obvious omissions are generally presumed to be intentional exclusions. *See Wolff Shoe Co. v. Dir. of Revenue,* 762 S.W.2d 29, 32 (Mo. banc 1988); *Gasconade Cnty. Counseling Servs., Inc. v. Mo. Dep't of Mental Health,* 314 S.W.3d 368, 376 n. 7 (Mo.App.2010).

Applying the ordinary rules of construction here supports the conclusion that in adopting section 508.012 the legislature intended to make a change in the existing law, and that the legislature was aware of the existing law at the time of the enactment. *See A.R.D.C., Inc. v. State Farm Fire & Casualty Co.,* 619 S.W.2d 843, 845 (Mo.App.1981). The legislature *did not* provide for *intervenors* in the statutory reforms in 2005. Prior to 2005, third parties *and* intervenors were *not* accounted for in the Chapter 508 venue statutes. *See State ex rel. Linthicum,* 57 S.W.3d at 858 n. 3. The legislature did specifically account for third-party plaintiffs and third-party defendants in section 508.012, denoting that the addition or removal of such category of third parties required a redetermination of venue. However, *intervenors* were not mentioned in the section 508.012 revisions. We can reasonably infer that the omission of "intervenors" in section 508.012, especially in light of the legislature's specific inclusion of third parties, was an intentional act by the legislature to exclude intervenors from falling under the purview of section 508.012.

 Not only is the intentional exclusion of intervenors logically inferred from the plain language of the statute itself, but such exclusion is reasonably inferred from a consideration of the context of the statute. While HLF would like to treat intervenors as normal plaintiffs, defendants, or third-party plaintiffs or defendants upon intervention for purposes of redetermination of venue, throughout the Missouri statutes and rules of civil procedure intervenors are treated as separate and distinct parties with their own governing rules.

> In construing a statute it is appropriate to take into consideration statutes involving similar or related subject matter when such statutes shed light upon the meaning of the statute being construed, even though the statutes are found in different chapters and were enacted at different times. When the legislature enacts a statute referring to terms which have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with knowledge of that judicial or legislative action.

*Citizens Electric Corp. v. Dir. of Dep't of Revenue,* 766 S.W.2d 450, 452 (Mo. banc 1989) (internal citations omitted). In Chapter 507 of the Missouri Revised Statutes, for example, the procedure for intervention is governed by section 507.090 and set off distinctly from rules governing every other type of party—including third parties. *See* §§ 507.030, .040, .060, .080. The same is true under Supreme Court Rule 52, which prescribes procedural rules for every type of party, including intervenors, which are governed solely by Rule 52.12, while third parties are addressed separately in Rule 52.11. The fact that intervenors are treated separately in the

case law, civil rules, and statutes for most other purposes is consistent with the notion that the legislature intentionally chose *not* to include intervenors in section 508.012. Thus, we believe that HLF, as an intervenor, is not entitled to stand on the same footing as a party plaintiff or defendant or third-party plaintiff or defendant within the application of section 508.012.

The federal courts, in applying Federal Rule of Civil Procedure 24, which is essentially identical to Rule 52.12, have considered the exact issue. We may consider any guidance we may gain from the federal decisions in this regard. *See State ex rel. Reser v. Martin,* 576 S.W.2d 289, 290–91 (Mo. banc 1978) (relying on the United States Supreme Court's interpretation of Rule 24(a) of the Federal Rules of Civil Procedure in interpreting Missouri Rule 52.12). Intervenors are generally held to have waived their privilege to change the venue of a suit. *See, e.g., Commonwealth Edison Co. v. Train,* 71 F.R.D. 391, 394 (N.D.Ill.1976) ("The intervenor cannot question venue. By voluntarily bringing himself into the action he has waived his privilege not to be required to engage in litigation in that forum."). Ample federal authority exists for this proposition. In *Defenders of Wildlife v. Bureau of Ocean Energy Management, Regulation, & Enforcement,* 791 F.Supp.2d 1158 (S.D.Ala. 2011), the Southern District of Alabama laid out such authority *ad nauseam,* and ultimately found that "[b]y voluntarily intervening in[to] th[e] action, the … Intervenors … invoked and acquiesced to the jurisdiction of th[e] District Court, and

thereby waived their privilege not to be required to engage in litigation in th[at] forum." *See id.* at 1173–75 (gathering and citing relevant authority). While it is true that section 508.012 is not applicable in the federal courts, and therefore we can discern only so much from the federal practice, still it is of value to see confirmation that to require reassessment of venue upon the participation of an intervenor would tend to have a destabilizing effect on the ability of courts to maintain the case in the established forum.

HLF contends that it could be considered a defendant because it was "forced to intervene to protect its interests." We disagree. This court recently held in *Wright v. Bartimus Frickleton Robertson & Gorny PC,* 364 S.W.3d 566–69, 2011 WL 4356175, at *6–7 (Mo.App.2011), that an attorney has a right under sections 484.130 and .140 to bring a motion in the original case for attorneys' fees *or* to bring a separate cause of action for attorneys' fees after a verdict, decision, or judgment has been rendered in a client's favor. *See also Plaza Shoe Store, Inc. v. Hermel, Inc.,* 636 S.W.2d 53, 56–57 (Mo. banc 1982); *Satterfield v. Southern Ry. Co.,* 287 S.W.2d 395, 397–98 (Mo.App.1956). No one doubts that HLF's attorneys' lien attached to the McCoys' cause of action in Jasper County.[11] The lien subsequently attached to the *res* of the proceeds of the settlement after it was approved by the trial court in Jackson County. HLF had the option of ignoring the Jackson County proceeding and filing its own separate cause of action.[12]

---

11. While HLF claims to have an attorney's lien on the proceeds of the settlement under both section 484.130 and .140, section 484.140, which provides an additional means of asserting an attorney's lien in contingency fee matters, requires that notice be given to defendants before the lien attaches to a cause of action, which was satisfied with the June 2,

2008 filing. In contrast, under section 484.130, an attorney's lien automatically attaches "[f]rom the commencement of an action or the service of an answer containing a counterclaim." *Downs v. Hodge,* 413 S.W.2d 519, 523 (Mo.App.1967).

12. If a former attorney chooses not to intervene or to otherwise voluntarily submit itself

"[A]ttorney's liens are considered to be 'remedial in nature [and] will be liberally construed.'" *Reed v. Reed*, 10 S.W.3d 173, 178 (Mo.App.1999) (quoting *Downs v. Hodge*, 413 S.W.2d 519, 523 (Mo. App.1967)). Remedial statutes are construed in such a way as to effect their beneficial purpose, and cases arising thereunder should be heard and decided on their merits. *Abrams v. Ohio Pacific Express*, 819 S.W.2d 338, 341 (Mo. banc 1991). HLF had the option to intervene, and it did so, securing a full hearing on the merits of its lien claim. The decision to intervene precluded the pursuit of a separate suit in Jasper County.

The cause of action for an attorneys' fees lien cannot be considered a claim brought by a defendant. The trial court did not err in regarding HLF as an intervenor, not a defendant. HLF did in fact lack standing as an intervenor to challenge the venue of the proceeding in Jackson County. *See Jewish Hosp. of St. Louis v. Gaertner*, 655 S.W.2d 638, 640 (Mo.App. 1983).

Point denied.

## II. Attorneys' Fee Award
### Standard of Review

The standard of review in the court-tried case on HLF's action in quantum meruit for recovery of attorneys' fees is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *See Plaza Shoe Store Inc.*, 636 S.W.2d at 60. This court will affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or it erroneously declares or erroneously applies the law.

*Murphy*, 536 S.W.2d at 32. This court views the evidence, and draws all reasonable inferences from it, in the light most favorable to the judgment, disregarding all evidence to the contrary. *Selby v. Selby*, 149 S.W.3d 472, 482 (Mo.App.2004).

This is a quantum meruit case, and it is also a case in which the issue in the trial court was the reasonable value of attorneys' fees. "The trial court is considered an expert on the question of attorney fees." *Dominion Home Owners Ass'n, Inc. v. Martin*, 953 S.W.2d 178, 182 (Mo. App.1997); *see also Goldstein & Price, L.C. v. Tonkin & Mondl, L.C.*, 974 S.W.2d 543, 549 (Mo.App.1998). "[I]n the absence of contrary evidence, the trial court is presumed to know the character of the services rendered in duration, zeal and ability, and to know the value of them according to custom, place, and circumstance." *Dominion Home Owners Ass'n*, 953 S.W.2d at 182.

### Analysis

HLF contends that the trial court erred in awarding HLF $40,000 in fees in the McCoys' medical malpractice case. HLF argues the trial court's award is inadequate and should be reversed, because the judgment lacks substantial evidence and the trial court misapplied the law because it failed to analyze "the benefit to the McCoys ... of HLF's experience, skill, and reputation in the undertaking, recognition and analysis of the necessarily difficult and complex medical and legal issues ... in the McCoys' potential traumatic birth medical malpractice case, the identification and retention of experienced, qualified experts, and filing of the action against the

---

to the authority of the court, no decision of the court can conclusively adjudicate anything that would bind the former attorney. *See Wright*, 364 S.W.3d 565–66, 2011 WL 4356175, at *5. We do not purport to decide,

and need not decide, the question of whether a party truly forced to intervene to protect its interests could be considered a "defendant" under the statute.

medical defendants." After reviewing the evidence, we find no error on the part of the trial court in the $40,000 award to HLF.

In *Plaza Shoe Store, Inc.*, the Missouri Supreme Court addressed the fee available to a lawyer hired on a contingent fee basis when the client has discharged the lawyer prior to the occurrence of the contingency. 636 S.W.2d at 60. Adopting what was termed the "modern rule," the Court limited recovery to "the reasonable value of services rendered, not to exceed the contracted fee, and payable only upon the occurrence of the contingency." *Id.* "[T]he lawyer['s] *only* recovery[,] [therefore,] could be in quantum meruit for the benefits conferred." *Risjord v. Lewis,* 987 S.W.2d 403, 405 (Mo.App.1999) (emphasis added).

▄▄▄▄ "An action sounding in quantum meruit is based upon a person's implied promise of reasonable and just compensation in return for the performance of valuable services, performed at that person's behest or with his approval." *Turpin v. Anderson,* 957 S.W.2d 421, 427 (Mo. App.1997). The party asserting the right to attorneys' fees in quantum meruit bears the burden of proving the reasonable value of services performed. *Id.* The failure to prove reasonable value is fatal to a quantum meruit claim. *Reid v. Reid,* 950 S.W.2d 289 (Mo.App.1997) (vacating an award of $65,000).

▄▄▄▄ To determine what constitutes a reasonable attorneys' fee value in quantum meruit, consideration must be given to: "(1) the time, nature, character and amount of services rendered; (2) the nature and importance of the litigation; (3) the degree of responsibility imposed on or incurred by the attorney; (4) the amount of property or money involved; (5) the degree of professional ability, skill and experience that was called for and used; and

(6) the result that was achieved." *Turpin,* 957 S.W.2d at 427; *see Plaza Shoe Store, Inc.,* 636 S.W.2d at 60 n. 7; Mo. Sup.Ct. R. 4–1.5 (2011). In addition, consideration must be given to the fact that a client does not have to pay for duplicative service, and the services rendered must have enriched the client in the sense of benefits conferred. *Int'l Materials Corp. v. Sun Corp., Inc.,* 824 S.W.2d 890, 895 (Mo. banc 1992).

The application of these factors must necessarily vary on a case-by-case basis depending on the circumstances. *See* Rule 4–1.5, comment (1) ("The factors specified in rule 4–1.5(a)(1)–(8) are not exclusive. Nor will each factor be relevant in each instance."). While HLF points out that "[t]he time taken to perform services is only one element considered, and usually of minor importance[,]" HLF seems to ignore the fact that in some cases, such as where the discharged attorney's services were preliminary, not complex, and were not a substantial contributing factor to the end result, a focus on the time and amount of services may be more appropriate than focusing on other factors. *See Goldstein & Price, L.C.,* 974 S.W.2d at 549. The trial court is vested with the discretion to evaluate these factors according to the particular circumstances of each case. *See, e.g., id.; Reid,* 950 S.W.2d at 291.

After hearing evidence on attorneys' fees in this case, and applying the foregoing factors to that evidence, the trial court entered the following pertinent findings of fact and conclusions of law in its Judgment and Order:

In the instant case, the Court was presented with "dueling experts" [retired] Judge J. Miles Sweeney and [retired] Judge John E. Parrish. Judge Sweeney made no estimate of the number of hours of work performed by

HLF, but opined that HLF should receive 50% of the total fee, based on the "reasonable value" of the work performed by HLF. Judge Parrish testified he believe[d] the work performed by HLF could reasonably have been performed by attorneys and paralegal[s] in 12 hours, and based his proposed fee of $4,800 on an hourly rate of $300 per hour multiplied by 12 hours of work. While this Court does not ignore the testimony of either Judge Sweeney or Judge Parrish, the Court believes it has the unique responsibility of determining the value of the legal services provided by Hershewe.

In analyzing the information available, the Court independently considers, among other matters, the factors testified to by [former] Judges Parrish and Sweeney, and considers the following factors to be most significant in determining the reasonable value of the services performed by Hershewe.

First, where, as here, HLF is unwilling to estimate the number of hours of work performed on the McCoy case, it is reasonable to make such an estimate. The Court finds that HLF reasonably performed between 12 and 25 hours of work on this matter.

Second, much of the work performed by HLF was, or reasonably could have been, performed by clerical employees and paraprofessionals.

Third, Aaron Smith, the attorney who performed the bulk of the legal work on the McCoy claim, was considered by Mr. Hershewe to have no experience in medical malpractice litigation, and was identified by him as being incompetent and unable to successfully handle the litigation. Therefore, Mr. Hershewe's own testimony does influence the opinion of this Court as to the value of the services performed by Mr. Smith or supervised by Mr. Smith.

Fourth, Mr. Hershewe has received recognition as a very successful medical malpractice attorney with experience in neonatal injuries. He performed minimal, but important legal services in the instant litigation that, due to his knowledge and experience, provided value to Riley McCoy and his parents that cannot be calculated solely based on the number of hours he worked on this matter.

Fifth, the recoveries of any fee by HLF, and the return of expenses to HLF, were both contingent on the successful conclusion of the litigation.

Sixth, Mr. Frickleton has received recognition as a very successful medical malpractice attorney with experience in neonatal injuries. Mr. Smith, Mr. Frickleton, Mr. Robertson and other professionals and paraprofessionals in their firms performed hundreds of hours of work, and presented evidence that the work they performed and the expertise they utilized had a significant impact on the settlement that was achieved in this matter that far surpasses the value of work performed by HLF.

HLF first argues that the trial court erred in applying the factors to reach the $40,000 award, because the court did not consider the "actual value of the benefits conferred to the McCoys," and instead chose to focus on the time HLF invested into the case. HLF contends that the attorneys' fee awarded to HLF was "reduced to an unsupported guess at how many hours it ... take[s] to complete an intake form, write for medical records and draft a petition." We think that assertion is an overly simplistic view of the trial court's decision. The trial court did consider the time and amount of work performed by HLF, including Ed Hershewe's

individual work and Aaron Smith's individual work, as it was compelled to do by Rule 4–1.5; however, this was clearly not the only consideration in the trial court's judgment.

The court heard evidence that the reasonable value of HLF's services could range anywhere from $4,800 up to $950,000.[13] J. Miles Sweeney, HLF's expert, testified that the critical work HLF performed in the McCoys' case included: 1) the McCoys preparing a standard form medical malpractice questionnaire; 2) Stacey McCoy executing an authorization for medical records; 3) requesting medical records from the defendants' hospital; 4) the McCoys executing an employment contract with HLF; 5) notifying the hospital in writing to provide the medicals records for Riley McCoy; 6) filing another medical records request; 7) providing Dr. Joseph Bruner with medical records and a $6,000 retainer; 8) filing an additional medical records request with the hospital; 9) filing a petition for damages and motion for appointment of next of friend; and 10) providing Dr. Scott Bailey with medical records and a $3,000 retainer.

Miles Sweeney *did not* provide an estimate of how long any of this preparation took, or should have taken, HLF. Instead, Sweeney concluded the McCoys benefitted significantly from HLF's initial intake and assessment of the case and from HLF's retaining of experts, regardless of the amount of time actually expended by HLF, and therefore a 50–50 equitable apportionment of the attorneys' fees between HLF and the other attorneys in the case was proper.

John Parrish broke down each of the tasks Sweeney identified as important to the McCoys' case, and estimated the time HLF spent on each, concluding the total time expended on the case to be between twelve to twenty-five hours. This conclusion was also supported by Smith's testimony that while he was employed at HLF, and served as the main attorney on the McCoy case, he spent less than ten hours working on the case. Parrish also described HLF's work as "quite preliminary" and concluded that most of the work was, or could have been, completed by paraprofessionals.

Viewing the evidence in the light most favorable to the judgment, the trial court reasonably assumed that HLF spent between twelve and twenty-five hours preparing "critical" components of the McCoys' case. Therefore, if the trial court had reduced the award to a mere estimation of the hours spent working on the case (twelve to twenty-five), as HLF contends, the total attorneys' fee award would have been somewhere between $3,600 and $7,500, based on the estimate of $300 per hour for the work. Because HLF was awarded $40,000 in attorneys' fees, we cannot agree that the trial court reduced the worth of the benefit of HLF's contribution to the case to "[twelve to twenty-five] hours that were or reasonably could have been performed by clerical employees and paraprofessionals." The trial court obviously took into account the "amount involved" and the "result obtained" in accordance with Supreme Court Rule 4–1.5; *see also Plaza Shoe Store*, 636 S.W.2d at 60. The "amount involved" was very substantial due to the nature of the injury. It was important that no inadvertence or recklessness cause damage or prejudice to the continued viability of the claim. The "re-

**13.** In its February 3, 2010 Order and Judgment, the trial court also approved the reimbursement of reasonable litigation expenses advanced by HLF, Smith, and BFRG as follows: 1) HLF was awarded $11,031.01; 2) Smith was awarded $4,826.00; and 3) the BFRG was awarded $26,069.05.

sult obtained" by HLF's efforts was that the McCoys had a petition on file meeting the pleading requirements of a medical malpractice claim, and two experts had been preliminarily engaged to assist with the case. There, of course, is value in having the claim properly on file and preliminary experts engaged, notwithstanding that BFRG later retained and employed other experts in the pursuit of the claim.[14]

HLF suggests that the decision here is akin to that in *International Materials Corp.* and argues that the ruling in that case requires reversal here. In *International Materials Corp.*, the trial court awarded attorneys' fees to two previous attorneys who worked on the case based solely on estimating the total number of hours each attorney worked and then valuing each hour with a dollar amount to reach the total owed to each. 824 S.W.2d at 893. The *International Materials Corp.* Court reversed the case and remanded it to the trial court, noting that no consideration was given to the "benefits conferred upon the client based upon actual value to the client," as the trial court simply found the two previous attorneys' "efforts contributed to 'the final victory.'" *Id.* at 896. The trial court was directed to identify and value services that allowed the subsequent counsel to more efficiently handle the lawsuit by providing some bases for the work of the subsequent lawyers. *Id.*

That case would be highly relevant authority here if the trial court had awarded HLF $5,000. Here, however, unlike in *International Materials Corp.*, the trial court did not value HLF's fees based solely upon the number of hours worked on

the case. Instead, the trial court recognized that HLF, and, in particular, Ed Hershewe, did more than merely contribute time to basic tasks of the case. The trial court found that Hershewe performed "minimal, but important legal services" in the litigation that, "due to [Hershewe's] knowledge and experience," provided value to Riley McCoy and his parents *"that cannot be calculated solely based on the number of hours he worked on this matter."* (Emphasis added.)

It seems reasonably apparent from the evidence that it was discernible from "day one" that this was a strong case for both liability and damages. The case involved a surviving child who suffered serious permanent brain damage. Ed Hershewe testified that he formed the impression early that it was a substantial case (with a value of more than $5 million) from his review of the medical records. HLF's efforts clearly did add value to the unfiled, dormant cause of action. But there was no evidence that HLF's efforts salvaged the case from the metaphorical "trash heap" and breathed life into it.

The trial court regarded the act of properly pleading the case and getting it on file as "important," but the trial court could reasonably have believed that the effort of doing so could be valued at $40,000 or less. There was much work remaining to be done at the time the case left HLF, including the retention of additional expert witnesses, the conduct of discovery, and the development of a trial strategy that would tend to lead to productive settlement negotiations within a relatively short period of time.

---

14. There would have been no way for the trial court here to determine whether HLF's experts (who were only preliminarily involved) were necessarily less adequate or less capable than the experts BFRG deemed it expedient to engage. Only one set of experts—BFRG's set of retained experts—was actually asked to prepare for depositions, mediation and settlement discussion, and, if necessary, trial.

HLF wishes to analyze the issue as the division of a "pie" of an overall attorneys' fee award among all the attorneys who participated. Smith and BFRG did have a "pie" of fees to divide according to their contractual relationship. But HLF had no contractual or other relationship to Smith and BFRG after the case left HLF. Once the case left HLF and followed Smith, it was no longer HLF's case. HLF does not ride on "the coattails" of Smith and BFRG's contract with the McCoys.[15] If Smith and BFRG had handled the case for no fee, HLF would still, notwithstanding the generosity of the other attorneys, be entitled to the reasonable value of the services provided to the clients, independent of the generosity of the other attorneys.

It is not as though HLF voluntarily turned the case over to Smith and BFRG subject to an agreement between all the lawyers for the division of fees. If there had been such an agreement, that agreement would control, and there would be one "pie" to be divided. Here, though, the court properly determined that it was not dividing a "pie" of a lucrative fee award as much as it was simply determining the *reasonable value* of the services provided by HLF according to the market for such services in light of the applicable factors; and the value determined might not necessarily be pegged to the final settlement

amount or the approved or contractual attorneys' fee recovery.[16]

Of course, the court could decide that where the client has received a very substantial settlement, the quantum meruit claim of a discharged attorney could be enhanced somewhat to reflect the relative importance of the services provided.[17] The judgment indicates that such an enhancement is exactly what the trial court here sought to provide to HLF. The court purported to consider the reasonable value of the services and to take into account the skill and expertise of HLF, and the benefit provided to the client, and the fact that recovery of any fee was "contingent on the successful conclusion of the litigation."

While judges could easily differ on the determination of the reasonable value of the services provided by HLF, we know of no authority that would justify an attempt by this court, as a reviewing court, to substitute our judgment for that of the trial court. The trial judge who heard the evidence first-hand is the judge best equipped to exercise the judgment and discretion called for by *Plaza Shoe Store.* The trial court *did* consider the success of the litigation amid all the other relevant factors discussed in the evidence.

HLF offered the trial court no cogent alternative theory of measurement beyond a weighted "coattail" notion that HLF should receive $950,000 in quantum meru-

15. Judge Sweeney's analysis arguably was something of a "coattail rider's right to divide a pie" analysis that did not discuss many of the pertinent factors in a quantum meruit award. The trial court was not required to adopt such an analysis.

16. We do not mean, of course, that the court has to be blind to the size of the settlement. Presumably the size of the settlement can be considered, but the trial court seemed to recognize that it would cause a distortion of the concept of "reasonable value" of the services to try to tie the quantum meruit award direct-

ly to the *attorneys' fee* awarded Smith and BFRG pursuant to *their* contractual agreement with the McCoys.

17. In this case, by agreements between the McCoys and Smith and BFRG, the attorneys, it was understood that any quantum meruit award to HLF would be paid from the attorneys' fee awarded to BFRG and Smith. Such might not always be the case, because absent such an agreement the holders of the settlement proceeds, including the client, will pay the award.

it, a valuation the trial court was entitled to reject because it was based strictly on a theory of equally dividing a "pie" as though there were some kind of contract between these attorneys rather than on an ordinary analysis of what a skilled attorney would be entitled to be paid in these circumstances for the services involved in drafting the petition, retaining experts preliminarily and advancing some fees, and getting the action on file.

"[T]he trial court sits as an expert in consideration of attorney fees due after consideration of all relevant factors." *Goldstein & Price, L.C.*, 974 S.W.2d at 549. We have no basis for upsetting the trial court's determination here. We will not reverse an award "unless the award is so arbitrary or unreasonable that it indicates indifference and lack of proper judicial consideration." *Id.*; *Cf. Reid v. Reid*, 950 S.W.2d 289 (Mo.App.1997) (vacating an award as unreasonable and arbitrary where law firm failed to prove it was entitled to any fee in quantum meruit).

We cannot say that the decision of the court here was not supported in the evidence, or was arbitrary or unreasonable, or that it resulted from a misapplication of law.

Point denied.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

All concur.